**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 15-3374
_____


YOSELIN LINET MARTINEZ CAZUN,
                                        Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
                                        Respondent


_____


On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No.:  A206-498-210)
Immigration Judge:  Honorable Walter A. Durling

_____


Argued on September 22, 2016
Before:  MCKEE, Chief Judge *, HARDIMAN and
RENDELL, <u>Circuit Judges</u>

(Opinion filed: May 2, 2017)

Matthew J. Archambeault
Corpuz & Archambeault
1420 Walnut Street
Suite 1188
Philadelphia, PA   19102

Charles Roth
Keren Zwick (**ARGUED**)
National Immigrant Justice Center
208 South LaSalle Street
Suite 1300
Chicago, IL   60604

Counsel for Petitioner

Jefferson B. Sessions III
United States Attorney General
Benjamin C. Mizer
Principal Deputy Assistant Attorney General
Shelley R. Goad
Assistant Director
Laura Halliday Hickein
Thomas W. Hussey
Carmel A. Morgan (**ARGUED**)

---

\*Judge McKee was Chief Judge at the time this appeal was argued.  Judge McKee completed his term as Chief Judge on September 30, 2016.

2

Civil Division
United States Department of Justice
Office of Immigration Litigation
P. O. Box 878
Ben Franklin Station
Washington, DC   20044

Counsel for Respondent

Rebecca A. Sharpless
Caroline McGee, Law Student
Immigration Clinic
University of Miami School Law
1311 Miller Drive, Suite E257
Coral Gables, FL   33146

Dree K. Collopy
Benach Collopy, LLP
1333 H Street, NW
Suite 900 West
Washington, DC  20005

Counsel Amicus for Petitioner

## O P I N I O N

**RENDELL**, Circuit Judge:

Yoselin Linet Martinez Cazun, a native and citizen of Guatemala, entered the United States illegally in 2014. She was detained and removed under an expedited removal order. Later that year, she attempted to re-enter the United States, was detained again, and her previous removal order was reinstated. When she attempted to apply for asylum, the Board of Immigration Appeals ("BIA") held that she was statutorily ineligible to apply because her previous order of removal had been reinstated. Cazun appeals that ruling.

This case thus presents a question that many of our sister circuits have already answered in the negative: may an alien subject to a reinstated removal order apply for asylum? Because we find that Congress has not spoken clearly on the issue in the relevant statute, we will give *Chevron* deference to the agency's reasonable statutory interpretation that aliens subject to reinstated removal orders are ineligible to apply for asylum.

## I. Background

### A. *Factual Background*

In March 2014, Cazun fled her native Guatemala following threats against her life by unknown persons. Upon arrival in the United States, Cazun was detained by

4

immigration authorities. Because Cazun expressed a fear of returning to Guatemala, an asylum officer interviewed her. The asylum officer made a negative credible fear determination, and an Immigration Judge ("IJ") affirmed that decision. Thus, an expedited order of removal was issued to Cazun, and she returned to Guatemala.

Upon Cazun's return to Guatemala, her circumstances grew more dire. The head of a drug trafficking gang threatened, tortured, and sexually assaulted her.[1] To escape, Cazun fled again to the United States, this time with her two-year-old son. On her attempted re-entry, Cazun was detained by Border Patrol.

After determining that Cazun had already been removed from the United States once before, the Department of Homeland Security ("DHS") notified Cazun that it intended to reinstate her previously entered removal order. Through this reinstatement process, the DHS would simply re-execute her previous removal order and deport her rather than initiating an entirely new removal process. But before deportation, Cazun expressed fear of returning to Guatemala, so she was interviewed by an asylum officer.[2] The asylum

---

[1]    The drug trafficker apparently targeted Cazun because of a debt owed him by the father of Cazun's child. Cazun was not married to the father of her child, but she lived with him.

[2]    Although an asylum officer conducted the interview, the only purpose of the interview was to determine Cazun's eligibility for withholding of removal and protection under the Convention Against Torture, not her eligibility for asylum.

officer made a negative reasonable fear determination, and an IJ affirmed that decision.

Subsequently, but still before deportation, Cazun consulted counsel and urged that she had been unable to reveal the full details of her suffering in her previous interview due to the psychological trauma she had endured in Guatemala. Consequently, she obtained a new interview with an asylum officer. At this interview, Cazun described being sexually assaulted, tortured, and facing threats against her life and the life of her son. The asylum officer concluded that Cazun's testimony was credible and that it established a reasonable fear of persecution. But because Cazun's previous removal order had been reinstated, she was placed in hearings before an IJ to determine her eligibility for withholding of removal and Convention Against Torture (CAT) protection only.

The IJ granted Cazun withholding of removal and protection under the regulations implementing obligations under the CAT, but would not consider Cazun's asylum request.[3] He stated that under current statutes and regulations,

---

[3] Aliens may prefer to seek asylum rather than withholding of removal or CAT protection for several reasons. First, unlike other forms of relief, asylum provides a pathway to lawful permanent resident status and, ultimately, citizenship. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987). Second, withholding of removal and CAT protection only prevent removal of an alien to the specific country from which she fled; asylum prevents removal from the United States altogether. *See id.* Third, withholding of removal status comes with several restrictions, including

Cazun was ineligible to apply for asylum due to her reinstated removal order.[4]

Cazun appealed to the BIA, which agreed with the IJ that Cazun was ineligible for asylum. The BIA based its decision on 8 U.S.C. § 1231(a)(5), which states that aliens like Cazun who are subject to a reinstated removal order are "not eligible and may not apply for any relief under [8 U.S.C. Ch. 12]." A.R. 3. The BIA further cited applicable regulations of the Attorney General that allow "an alien fearing persecution to apply for *withholding of removal only*." A.R. 3. (emphasis added) (citing 8 C.F.R. §§ 1208.31(e), 1208.31(g)(2); 1241.8(e)). Cazun timely appealed the BIA's ruling to this Court, urging that she is eligible for asylum pursuant to the asylum provision, and it should apply notwithstanding her reinstated removal order.

---

potential limitations on the ability to work and travel internationally. 8 C.F.R. § 274a.12(a)(10); 8 C.F.R. § 241.7.

Finally, the standard for asserting a successful asylum claim is less demanding than the standard for withholding of removal or CAT protection. *Compare Cardoza-Fonseca*, 480 U.S. at 430–32 ("well-founded fear" standard applies to asylum applications), *with* 8. C.F.R. § 1208.16(b)(1)(iii) (applicant for withholding of removal must prove she "more likely than not" will suffer harm if returned to native country), *and* 8 C.F.R. § 1208.16(c)(2) (applicant for CAT protection must establish she "more likely than not" would be tortured if returned to native country).

[4] Cazun's young son, who was not subject to a reinstated removal order, was granted asylum.

*B. Statutory Background*

The issue presented by Cazun's appeal arises from two separate but related statutes: 8 U.S.C. § 1158, the asylum statute, and 8 U.S.C. § 1231(a)(5), the reinstatement bar.[5]

i. Asylum Statute

The initial version of § 1158 was enacted by the Refugee Act of 1980, affording "an alien" the right to apply for asylum "irrespective of immigration status." *See* Refugee Act of 1980, Pub. L. No. 96-212, § 208 (codified as amended at § 1158). "The purpose of the [Act] . . . was 'to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States.'" *Marincas v. Lewis*, 92 F.3d 195, 198 (3d Cir. 1996) (quoting Pub. L. No. 96-212, tit. I, § 101(b), 94 Stat. 102 (1980)).

In 1996, Congress altered the statutory scheme,[6] enacting the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, Div. C, 110 Stat. 3009. IIRIRA preserved and in many ways replicated the initial version of § 1158. In its updated form, § 1158(a)(1) instructed that "[a]ny alien who is physically

_____

[5]　For ease of reference, unless otherwise noted, statutory sections referenced in the remainder of this opinion come from Title 8 of the United States Code.

[6]　Congress had previously amended the statute in 1990 to forbid individuals convicted of aggravated felonies from being granted asylum. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 515.

present in the United States . . . irrespective of such alien's status, may apply for asylum in accordance with this section."

Despite this seemingly broad guarantee, Congress carved out exceptions for several classes of aliens making them statutorily ineligible to apply for asylum: those who could be safely resettled into another country, *see* § 1158(a)(2)(A), those who failed to timely apply, *see* § 1158(a)(2)(B), and those previously denied asylum, *see* § 1158(a)(2)(C). However, even in the face of these exceptions, § 1158(a)(2)(D) created an exception to the exceptions: despite a previous denial of asylum or tardy asylum application, an alien could apply if she could demonstrate "changed circumstances which materially affect [her] eligibility for asylum or extraordinary circumstances relating to the delay in filing an application."

### ii. Reinstatement

IIRIRA also altered the effect of a previously entered removal order. Before IIRIRA, previous removal orders were not reinstated against aliens who re-entered the country. Instead, these aliens were placed in the same removal proceedings as other aliens who had not previously been removed. Reinstatement of a previous removal order was reserved for only a subset of individuals. *See Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 33–35 (2006).

But in IIRIRA, Congress hardened the effect of a reinstated removal order. As the Supreme Court noted, in enacting this provision Congress "toed a harder line" with respect to reinstatement. *Id.* at 34. The Act broadened the applicability of reinstatement, and it "explicitly insulate[d]

the removal orders from review, and generally foreclose[d] discretionary relief from the terms of the reinstated order." *Id.* at 34–35.

The new reinstatement provision reads:

If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, *the alien is not eligible and may not apply for any relief under this chapter*, and the alien shall be removed under the prior order at any time after reentry.

§ 1231(a)(5) (emphasis added). "[T]his chapter" refers to Chapter 12 of Title 8 of the U.S. Code, which contains both the asylum statute and the reinstatement bar.

### iii. Attorney General's Interpretation of the Statutory Scheme

Three years after Congress enacted IIRIRA, the Attorney General promulgated 8 C.F.R. § 1208.31(e),[7] instructing that "[i]f an asylum officer determines that an

---

[7] Though the regulation was originally promulgated as 8 C.F.R. § 208.31(e), it was recodified in 2003 as 8 C.F.R. § 1208.31(e). Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824 (Feb. 28, 2003). We use this updated numbering throughout the opinion for consistency.

alien [subject to a reinstated removal order] has a reasonable fear of persecution or torture, the officer shall so inform the alien and issue a . . . [r]eferral to [an] Immigration Judge, *for full consideration of the request for withholding of removal only*." (emphasis added).

The Attorney General clarified that under the regulations aliens subject to reinstated removal orders were "ineligible for asylum" but "may . . . be entitled to withholding of removal" or CAT protection. Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8485 (Feb. 19, 1999). This distinction between withholding of removal and asylum for those subject to reinstated removal orders "allow[ed] for the fair and expeditious resolution of . . . claims without unduly disrupting the streamlined removal process applicable to . . . aliens [subject to reinstated removal orders]." *Id.* at 8479.[8] In brief, the Attorney General determined that the statutory scheme forbade aliens subject to reinstated removal orders from applying for asylum, but allowed such aliens withholding of removal. The BIA relied on this interpretation in deciding Cazun's case.

---

[8]    The Attorney General identified § 1158 as one of the statutes giving the agency authority to promulgate regulations to govern asylum and withholding procedures. *Id.* at 8487.

## II. Discussion[9]

The issue before us is whether an alien whose removal order is reinstated is statutorily ineligible to apply for asylum. We must reconcile two apparently conflicting provisions of the INA, both enacted on the same day. On the one hand, § 1158(a)(1) allows "any alien" "irrespective of such alien's status" to apply for asylum. On the other hand, § 1231(a)(5) instructs that an alien subject to a reinstated removal order "is not eligible and may not apply for any relief under this chapter."

We are not the first court to consider the effect of a reinstated removal order. To date, four Courts of Appeals have addressed this question. Each has concluded that individuals subject to reinstated removal orders may not apply for asylum, though the courts have parted ways in their rationales.[10] Three of these courts have found the

---

[9] We have jurisdiction pursuant to § 1252. The Board's jurisdiction arose under 8 C.F.R. §§ 1003.1(b)(3) & 208.31(e) (2014).

[10] *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1082 (9th Cir. 2016) (statutory scheme was ambiguous and *Chevron* deference was warranted because the Attorney General's interpretation was reasonable); *Jiminez-Morales v. U.S. Att'y Gen.*, 821 F.3d 1307, 1310 (11th Cir. 2016) (plain text of § 1231(a)(5) supported conclusion that aliens subject to reinstated removal orders cannot apply for asylum); *Ramirez-Mejia v. Lynch*, 794 F.3d 485, 491 (5th Cir. 2015), *reh'g en banc denied*, 813 F.3d 240 (5th Cir. 2016) ("Section 1231(a)(5)'s plain language, relevant regulations, and analogous case law all compel the conclusion that aliens

12

reinstatement bar clear on its face.[11] But these courts "mention[] [the asylum provision] only in passing, or not at all."[12] Only the Ninth Circuit explicitly considered the interplay between the asylum provision and the reinstatement bar. Following the analytic path set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), that Court determined that the statutory scheme was ambiguous, and that the Attorney General's interpretation forbidding aliens subject to reinstated removal orders from applying for asylum to be reasonable. *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1077, 1082 (9th Cir. 2016), *reh'g and reh'g en banc denied* (9th Cir. 2017). We agree.

Using the same *Chevron* framework that the Ninth Circuit employed, we first assess whether "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If we can discern congressional intent using the plain text and traditional tools of statutory construction, our inquiry ends: we give effect to Congress's intent. *See id.* at 843. If, however, the statute remains ambiguous, we defer to the agency's reasonable interpretation of the statutory scheme, even if the interpretation is not what we would

---

whose removal orders are reinstated may not apply for asylum."); *Herrera-Molina v. Holder*, 597 F.3d 128, 138–39 (2d Cir. 2010) (plain text, Attorney General's regulations, and precedent all supported conclusion that aliens subject to reinstated removal orders could not apply for asylum).

[11] *Jiminez-Morales*, 821 F.3d at 1310; *Ramirez-Mejia*, 794 F.3d at 491; *Herrera-Molina*, 597 F.3d at 138–39 (2d Cir. 2010).

[12] *Perez-Guzman*, 835 F.3d at 1074 (citations omitted).

otherwise choose. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

A. Chevron *Step One*

In discerning congressional intent, we look first to the plain text of the statute. *CSX Trans., Inv. v. Ala. Dep't of Revenue*, 562 U.S. 277, 283 (2011). In this case, the text does not indicate clear and unambiguous congressional intent. Both provisions at play use broad language to characterize their mandates: that "any" alien can apply for asylum, § 1158(a)(1), but that aliens subject to reinstated removal orders are barred from "any relief," § 1231(a)(5). "Read naturally, the word 'any' has an expansive meaning . . . ." *United States v. Gonzales*, 520 U.S. 1, 5 (1997). It means "one or some indiscriminately of whatever kind." *Id.* (quoting Webster's Third New International Dictionary 97 (1976)).

But despite use of the word "any," neither section is as broad as it first seems. As to § 1158(a)(1), despite claiming that "any" alien may apply for asylum, the section then lists specific groups of aliens who may not in fact apply. §1158(a)(2)(A)–(C). So, it is not "any" alien who can apply, but only certain classes of aliens. As to §1231(a)(5), although the section bars "any relief" under the chapter, precedent and the Attorney General's own interpretation clarify that withholding from removal and CAT protection—both forms of relief[13] —are actually still available to individuals in

---

[13] Despite both sides' arguments to the contrary, neither statute nor caselaw supports any argument that either asylum or withholding of removal is not in fact "relief" in this case. *See, e.g., Yusupov v. Att'y Gen. of United States*, 518 F.3d

reinstatement proceedings. *See Fernandez-Vargas*, 548 U.S. at 35 n.4; 8 C.F.R. §§ 1208.31(e), 1208.16(c)(4). Here, the plain language of the statute offers no insight into Congress's intent as to how we should interpret the interplay between the two sections at issue.

Nor can we discern Congress's clear intent using "traditional tools of statutory construction." *Chevron*, 467 U.S. at 843 n.9. To start, both sides rely on the canon *generalia specialibus non derogant*, that the specific governs the general in interpreting a statutory scheme. *See Nitro-Lift Techs., L.L.C. v. Howard*, 133 S. Ct. 500, 504 (2012). The logic behind this canon is quite simple: when there are two conflicting provisions, we can assume that "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *Radlax Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 519 (1996) (Thomas, J., dissenting)). Thus, the more specific section targets the specific question at issue and that section should control our interpretation.

---

185, 188 n.1 (3d Cir. 2008) (referring to withholding of removal as "relief"); *Ghebrehiwot v. Att'y Gen. of United States*, 467 F.3d 344, 351 (3d Cir. 2006) (same); *Johnson v. Gonzales*, 416 F.3d 205, 211 (3d Cir. 2005) (referring to asylum as relief); *see also* § 1229(a)(c)(7)(C)(ii) (referring to asylum as relief); *United States v. Denedo*, 556 U.S. 904, 909 (defining the "familiar meaning" of "relief" as "any 'redress or benefit' provided by a court (quoting Black's Law Dictionary 1317 (8ᵗʰ ed. 2004)).

Here, however, the canon does not help us resolve the question definitively, because each subsection is more specific in certain respects and more general in others. Section 1158(a)(1) speaks with specificity as to a type of relief Cazun seeks: asylum. But § 1231(a)(5) speaks with specificity as to a subset of aliens: those, like Cazun, subject to reinstated removal orders. While Judge Hardiman makes several persuasive arguments as to why he finds the reinstatement bar the more specific provision, Concurrence Typescript at 6–9, we are not convinced that this canon renders the statutory scheme clear at *Chevron*'s first step, especially given the asylum bar's explicit applicability to aliens "irrespective of [their] status."[14]

---

[14] Cazun briefly argues that the rule of lenity, or its immigration corollary, supports her favored interpretation. *See Cardoza-Fonseca*, 480 U.S. at 449. But we have never found that such a rule of construction clarifies an ambiguous statute, especially one with two conflicting provisions, such that it does away with the need to proceed to *Chevron*'s second step. *Cf. Babbitt v. Sweet Home Chapters of Cmtys. for Great Ore.*, 515 U.S. 687, 704 n.18 (1995). Indeed, we use the immigration rule of lenity "as a canon of last resort" when interpreting statutory ambiguities. *Valansi v. Ashcroft*, 278 F.3d 203, 214 n.9 (3d Cir. 2002). "It cannot be the case . . . that the doctrine of lenity must be applied whenever there is an ambiguity in an immigration statute because, if that were true, it would supplant the application of *Chevron* in the immigration context." *Ruiz-Almanzar v. Ridge*, 485 F.3d 193, 198 (2d Cir. 2007). To the contrary, deference is especially applicable in the immigration context. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999). We also note that the policy concerns animating the rule of lenity—executive

Nor does legislative history clarify Congress's intent on the matter. "IIRIRA's amendments to the INA show Congress intended to add more detail to the existing asylum scheme while simultaneously expanding the scope and consequences of the reinstatement of an earlier removal order." *Perez-Guzman*, 835 F.3d at 1076. Because Congress enacted the two conflicting provisions on the same day, cherry picking statements from legislative history tends to ignore congressional intent on the opposing provision. Legislative history is of little use in helping us resolve this question.

Cazun offers a number of other arguments to support her position that the statute is clear on its face. None are convincing. First, she emphasizes a minor textual change Congress made when it recrafted the INA in 1996. The original text of the asylum provision had stated that "an" alien could apply for asylum irrespective of status; the updated text provided that "any" alien could do so. *Compare* § 1158(a) (1980), *with id.* § 1158(a)(1) (1996). We think this change is of little interpretive significance, because on the same day that Congress made the change it forbade those subject to reinstated removal orders from obtaining "any" relief. Certainly this minor alteration does not clearly express Congress's intent on the matter.

Second, Cazun suggests that making aliens subject to reinstated removal orders ineligible for asylum risks running afoul of treaty obligations under the United Nations Protocol

encroachment on legislative powers and notice to defendants accused of crimes, *see Esquivel-Quintana v. Lynch*, 810 F.3d 1019, 1023 (6th Cir. 2016)—are not implicated in this case.

Relating to the Status of Refugees ("Protocol"),[15] or that treaty obligations should at least inform our reading of the statute. But, given the availability of withholding of removal and CAT protection, there is no treaty obligation in conflict with the Government's reading. *See Ramirez-Mejia v. Lynch*, 813 F.3d 240, 241 (5th Cir. 2016) (denying rehearing en banc).[16]

---

[15] The United States agreed to comply with the substantive provisions of Articles 2 through 34 of the 1951 United Nations Convention Relating to the Status of Refugees ("Convention") in 1968. *Cardoza-Fonseca*, 480 U.S. at 429 (citing 19 U.S.T. 6223, 6259–6276, T.I.A.S. No. 6577 (1968)). The Protocol incorporated the Convention. *Marincas*, 92 F.3d at 197.

[16] Cazun points to three specific Articles from the Protocol to support her proposed interpretation. None convince us as to Congress's clear intent. First, she highlights Article 34, which urges nations to assimilate refugees. But this Article is merely "precatory." *Cardoza-Fonseca*, 480 U.S. at 441.

Second, she turns to Article 28, which requires signatories to afford refugees travel documents. She contends that the travel restrictions placed on recipients of withholding violate this Article, so she must be granted the right to apply for asylum. But we have noted that the Protocol is "not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation." *Al-Fara v. Gonzales*, 404 F.3d 733, 743 (3d Cir. 2005). And even assuming that this Article should influence our interpretation, it does not provide the support Cazun contends. Her reasoning that withholding of removal "effectively trap[s her] within the United States," *Pet. Br.* at 33, misstates the relief's effect. As

Finally, Cazun argues that our reasoning in *Marincas v. Lewis*, 92 F.3d 195 (3d Cir. 1996), counsels that we find the INA to be clear and unambiguous here. In that case, we considered whether the Refugee Act of 1980 required that stowaways receive the same asylum proceedings as non-stowaway aliens. One provision of the INA commanded that the Attorney General establish "a procedure"—singular—for aliens to apply for asylum "irrespective of [the] alien's status." § 1158(a) (1980). But an earlier-enacted provision instructed that stowaways, a specific class of aliens, were not entitled to an exclusion hearing, where the asylum determination took place. *Marincas*, 92 F.3d at 198. Thus, the BIA reasoned such stowaway applicants for asylum were not entitled to the same adversarial adjudication before an IJ that other aliens received at an exclusion hearing. *See id*. at 199–200. Instead, the BIA concluded that stowaways applying for

---

a recipient of withholding of removal and CAT protection, Cazun remains free to leave the United States: she simply cannot return to the United States without approval from immigration authorities.

Third, Cazun points to Article 31(1), which forbids countries from imposing "penalties" "on account of [an applicant's] illegal entry or presence." She argues that the reinstatement bar constitutes such a penalty. Again, even assuming this Article should influence our interpretation, neither the text of the Article nor its history clearly indicates that the reinstatement bar, which does not imprison or fine aliens, is the sort of criminal "penalty" forbidden. *See* James C. Hathaway, The Rights of Refugees Under International Law, 405, 408, 411 (2005). In short, this non-self-executing treaty provides no basis for finding that Congress spoke clearly on the issue at hand.

asylum should receive only a non-adversarial interview before an INS employee. *See id.* at 199–200.

We rejected the BIA's distinction between stowaways and other aliens with respect to asylum proceedings. We found that, regarding the question we faced there, "the plain meaning of the Refugee Act is clear and unambiguous" at the first step of *Chevron*. *Id.* at 200. Because the statute required "a uniform" procedure for an alien to apply for asylum "irrespective of such alien's status," we found that Congress did not intend to allow one procedure for stowaways and another for other aliens. *See id.* at 201. However, we noted that stowaways' hearings could be limited to the issue of asylum, and that their hearings need not reach any other exclusion issue.

Cazun likens her case to *Marincas*: one provision of the INA singles out her group—those subject to reinstated removal orders—for less favorable immigration procedures than other aliens, while another provision envisions equal asylum procedures for all aliens.

Cazun's analogy fails, however, for several reasons. First, as Cazun herself agreed at oral argument, in *Marincas* we considered a different statute altogether than the one we analyze today. There, we interpreted the Refugee Act of 1980, not IIRIRA. Although the language of the asylum provision remained largely unchanged by IIRIRA, the statutory scheme as a whole shifted dramatically. Therefore, *Marincas*'s interpretation of the asylum provision enacted in 1980 does little to clarify what Congress intended when it enacted IIRIRA, which included the broad reinstatement bar, sixteen years later.

Second, even setting this difference aside, common principles of statutory interpretation distinguish Cazun's case from *Marincas*. When interpreting statutes, we work to "fit, if possible, all parts [of a statute] into an harmonious whole." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959)). In *Marincas*, we were able to so harmonize the statutory scheme without doing serious damage to either of the provisions at issue. For although we held that stowaways were entitled to the same adversarial hearing as other aliens, we nonetheless reasoned that the stowaway's hearing could be limited to the issue of asylum eligibility: consistent with the stowaway provision's dictates, the asylum hearing need not reach any other issue of exclusion. *Marincas*, 91 F.3d at 201. Thus, our ruling harmonized the seemingly contradictory provisions, and we were able to preserve the "basic thrust" of the stowaway provision. *Id.* Here, Cazun offers no similar way for us to preserve both § 1158(a) and § 1231(a)(5).

Finally, at the core of our reasoning in *Marincas* was a commitment to discerning congressional intent. We found strong support for the idea that "Congress clearly intended a single, uniform procedure be established" with respect to asylum proceedings. *Id*. So when we interpreted the weighty asylum provision alongside a somewhat cursory, technical provision regarding stowaways, it was not difficult to conclude that Congress intended that the asylum provision should control. But here, we must square the asylum provision that affords relief with the reinstatement bar that takes such relief away. We know that Congress intended the reinstatement bar to be taken seriously, s*ee Fernandez-*

*Vargas*, 548 U.S. at 33–35, and that the provision should be given considerable weight in interpreting the provisions. Thus we cannot say, as we did in *Marincas*, that Congress clearly intended that one provision or the other should control. Because of these differences, we cannot reconcile the provisions so as to find the INA "clear and unambiguous" here.[17]

The Attorney General's arguments that the text is clear and unambiguous fare no better than Cazun's. For while the Government focuses on language barring aliens from "any relief," it ignores the affirmative asylum provision, which applies on its face to "any alien . . . , irrespective of such alien's status." Accordingly, because the statute does not clearly indicate congressional intent, we proceed to the second step of *Chevron*.

*B.* Chevron *Step Two*

At the second step of *Chevron*, we defer to the agency's interpretation of the statute as long as that reading is reasonable. *Brand X Internet Servs.*, 545 U.S. at 980. Deference to the executive branch is "especially appropriate in the immigration context" where officials must make complex policy judgments. *See Aguirre-Aguirre*, 526 U.S. at 425; *Yosupov*, 518 F.3d at 197. We must therefore decide whether 8 C.F.R. § 1208.31(e)—which prevents individuals

---

[17] In addition, two other factors supported our analysis in *Marincas* that are not at issue today: a concern for basic due process rights once an applicant was entitled to an asylum proceeding, 92 F.3d at 203–04, and the Board's seemingly inconsistent statutory interpretations, *id.* at 201–02.

subject to reinstated removal orders from applying for asylum—is a reasonable interpretation of the statutory scheme.[18]

It was reasonable for the agency to conclude that the statutory reinstatement bar foreclosing "any relief under this chapter" means just what it says: no asylum relief is available

---

[18]      As a threshold matter, we reject Cazun's argument that the interpretation does not merit *Chevron* deference because the agency did not appreciate the statutory ambiguity at issue. She cites out-of-circuit cases for the proposition that an agency failing to appreciate statutory ambiguity deserves no deference. *Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350 (D.C. Cir. 2006); *Cajun Elec. Power Coop., Inc. v. F.E.R.C.*, 924 F.2d 1132 (D.C. Cir. 1991).

But even those non-binding cases do not support her position. Despite some language in *Cajun Electric Power Coop., Inc.* supporting Cazun's argument, that case involved interpretation of a contract, not a statute. 924 F.3d at 1135. And in *Peter Pan Bus Lines, Inc.*, the agency mistakenly felt *compelled* to reach the conclusion it did. 471 F.3d at 1354; *see also Negusie v. Holder*, 555 U.S. 511, 521 (2009) (refusing to apply *Chevron* deference where agency mistakenly deemed its interpretation "mandated" by precedent). Here, Cazun seems to infer from the Attorney General's lack of discussion about the asylum statute that the agency felt similarly compelled to arrive at the conclusion it did. But this inference is unsubstantiated. On the contrary, the agency's explanation demonstrated that it relied on its own expertise to balance Congress's goals of efficiency and fairness in the screening process. *See* 64 Fed. Reg. at 8485.

to those subject to reinstated removal orders. Certainly this interpretation was not unreasonable: two Courts of Appeals have explicitly adopted the same interpretation without even finding the statutory scheme ambiguous. *Jiminez-Morales*, 821 F.3d at 1310; *Ramirez-Mejia*, 794 F.3d at 489–91.[19]

Even independent of these courts' conclusions, at least four factors lend support to the agency's interpretation. First, as discussed at length in Judge Hardiman's concurrence, the reinstatement bar is, at least in some respects, more specific than the asylum provision. It applies to a far narrower group of aliens—those subject to reinstated removal orders—than the asylum provision, which applies to all aliens. From a purely textual standpoint, this in and of itself might compel us to agree with the Attorney General were we forced to decide the issue without resorting to *Chevron*.

Second, the Supreme Court has already emphasized congressional intent as to IIRIRA in *Fernandez-Vargas*, 548 U.S. at 33: Congress meant to strengthen the effect of the reinstatement bar. *See also* H. R. Rep. No. 104-469(I), at 155 (1996) ("[T]he ability to cross into the United States over and over with no consequences undermines the credibility of our efforts to secure the border."). The agency's interpretation is faithful to that intent. For aliens who re-enter our shores illegally despite previous removal and instructions not to return, the Attorney General's interpretation takes asylum off

---

[19] While the Second Circuit concluded in *Herrera-Molina* that aliens subject to reinstatement removal orders could not apply for asylum, that case did not explicitly interpret the reinstatement bar. 597 F.3d at 138–39.

the table while allowing other forms of relief that fulfill humanitarian commitments.

Third, the Supreme Court has emphasized that the Attorney General can deny asylum in the agency's discretion even when an alien meets the criteria for asylum. *Cardoza-Fonseca*, 480 U.S. at 423–24; *see also* § 1158(d)(5)(B). It would be strange to find that granting asylum is discretionary, but that the Attorney General *must* allow Cazun to apply, even in the face of contradictory statutory text.

Finally, the agency has expertise making complex policy judgments related to asylum, withholding of removal, and CAT protection. Deference regarding questions of immigration policy is especially appropriate. *See Aguirre-Aguirre*, 526 U.S. at 425.

All this is not to say that the agency's position is flawless. To start, the Attorney General's interpretation bars from asylum those like Cazun whose compelling claims arose after their first removal order was issued. This is at least in tension with the text of § 1158(a)(2)(D), which allows aliens who can demonstrate changed circumstances to apply for asylum even when a previous application was rejected.

Further, the Attorney General's reading seems counterintuitive as applied to someone in Cazun's situation. An alien like Cazun who complies with a removal order is barred from asserting an asylum claim on illegal reentry. But aliens ordered to be removed who evade deportation are not similarly barred: those aliens never left the country, so their first removal order remains in effect and is not subject to reinstatement. Thus, such non-compliant aliens avoid the

reinstatement bar and may apply for asylum in the face of changed circumstances, while those who comply with the removal order but reenter illegally cannot.

However, these points are not fatal to the Government's case. For while the Government's reading leaves vulnerable those like Cazun whose claims for asylum arose after they were previously removed, as the Government urged in briefing and oral argument, reinstatement of a removal order is not automatic. *See* § 1231(a)(5); *Perez-Guzman*, 835 F.3d at 1081 ("[T]he government has discretion to forgo reinstatement and instead place an individual in ordinary removal proceedings." (citing *Villa-Anguiano v. Holder*, 727 F3d 873, 878 (9th Cir. 2013))). The agency may rely on this flexibility when deciding whether to reinstate a previous removal order. Exercising this discretion in cases like Cazun's speaks to the "wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress." *Chevron*, 467 U.S. at 866.[20] As a result, we will defer to the agency's expertise on complex matters of immigration policy such as the one before us today. *See Aguirre-Aguirre*, 526 U.S. at 425.

**III. Conclusion**

---

[20] To the extent that prosecutorial discretion is denied to aliens such as Cazun, we note that the reinstatement bar applies only to "an alien who has reentered the United States *illegally*." § 1231(a)(5) (emphasis added). Thus, aliens subject to removal orders may continue to apply for asylum by *lawfully* approaching a port of entry without illegally crossing the border.

In summary, the agency's interpretation of the ambiguous statute is reasonable. When Congress enacted IIRIRA, it set the agency adrift between an interpretive Scylla and Charybdis. No reading—including Cazun's—could harmonize the statutory scheme perfectly. But because the Attorney General's reading, bolstered by its own expertise, is reasonable, we will defer to it and uphold the decision of the BIA.

*Yoselin Linet Martinez Cazun v. Attorney General United States*, No. 15-3374

HARDIMAN, *Circuit Judge*, concurring in the judgment.

Under *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984), we do not defer to an agency's construction of a statute when "Congress has directly spoken to the precise question at issue." *Id*. at 842. At issue in this appeal is whether Yoselin Cazun may apply for asylum even though she is the subject of a reinstated removal order. To answer that question we must analyze two provisions of the Immigration and Naturalization Act: 8 U.S.C. § 1158 (the "asylum provision") and § 1231(a)(5) (the "reinstatement bar"). The asylum provision permits "[a]ny alien" to apply for asylum, while the reinstatement bar precludes aliens subject to reinstated removal orders from applying for "any relief." Based on the text, history, and structure of the statute, I would hold that the reinstatement bar precludes Cazun from applying for asylum. This interpretation fulfills our duty to "fit, if possible, all parts [of this statute] into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citation omitted).

Three of our sister courts agree that the INA precludes aliens like Cazun from applying for asylum. *See Jimenez-Morales v. Att'y Gen.*, 821 F.3d 1307, 1310 (11th Cir. 2016) (holding an alien with a reinstated removal order "is not eligible for and cannot seek asylum"); *Ramirez-Mejia v. Lynch*, 794 F.3d 485, 490 (5th Cir. 2015) (holding the reinstatement bar, "read plainly, broadly denies all forms of redress from removal, including asylum"), *pet'n for reh'g en banc denied*, 813 F.3d 240 (5th Cir. 2016); *Herrera-Molina v. Holder*, 597 F.3d 128, 138–39 (2d Cir. 2010) (accepting

1

regulations applying restrictions to aliens subject to reinstatement removal orders as correct statutory interpretations); *see id.* at 137 (discussing "the availability of suspension of deportation or asylum" and noting "the terms of [the reinstatement bar] preclude such relief"). *But see Perez-Guzman v. Lynch*, 835 F.3d 1066, 1076–77 (9th Cir. 2016) (finding the statute ambiguous and deferring to the Agency). And while I agree with the Ninth Circuit in *Perez-Guzman* and with the Majority that the Agency's interpretation here is reasonable, I would join the Eleventh, Fifth, and Second Circuits in finding that it is compelled by the statute.

I

The provisions at issue in this appeal were codified in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. No. 104-208, Div. C, 110 Stat. 3009 (1996). IIRIRA recodified the asylum provision at § 1158 and enacted for the first time the reinstatement bar codified at § 1231(a)(5), which prohibits illegal reentrants from applying for "any relief" under the statute.

The asylum provision as recodified in IIRIRA retained its original scope and was reformatted in two sections. One section provides that "[a]ny alien . . . , irrespective of such alien's status, may apply for asylum" if present in the country, and the other section lists some exceptions to the general provision. § 1158(a)(1)–(2).

IIRIRA also implemented a more efficient process for the reinstatement of removal orders. Before 1996, those who entered the United States illegally after having been deported typically were placed in a new round of regular deportation

proceedings. *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 33–34 (2006). IIRIRA streamlined the system by reinstating prior orders of removal as of their original start date, thus hastening the removal process.[1] As such, aliens with reinstated orders may be removed "at any time after the reentry," without new administrative hearings or any opportunity for review. § 1231(a)(5). Most important for purposes of this appeal, reinstated orders disqualify those who reenter after prior removal from obtaining "any relief under this chapter." *Id.*

As the Supreme Court noted, the reinstatement bar "toed a harder line" by "appl[ying] to *all* illegal reentrants." *Fernandez-Vargas*, 548 U.S. at 34–35 (emphasis added). This "harder line," *id*. at 34, punishes and deters the criminal act of reentering the country illegally, *see* 8 U.S.C. § 1326. *See generally In re Briones*, 24 I. & N. Dec. 355, 370–71 (B.I.A. 2007) ("[O]ne of the chief purposes of the IIRIRA . . . was to overcome the problem of recidivist immigration violations by [*inter alia*] escalating the punitive consequences . . . of illegal reentry." (citing IIRIRA §§ 105(a)(2), 301(b)(1), 303(a), 305(a)(3), (b)(3), 324(a), 326, 332, 353(b), which "expedite the detection, deterrence, and punishment of recidivist immigration violators")).

The Immigration and Naturalization Service implemented the reinstatement bar by promulgating regulations that established expedited removal proceedings for illegal reentrants subject to a prior removal order, 8 C.F.R.

---

[1] IIRIRA also consolidated deportation and exclusion proceedings into one "removal" proceeding. *See* 8 U.S.C. § 1227. The reinstatement provision further streamlines this removal process for aliens with reinstated removal orders.

§ 241.8(a), (c), and precluded those aliens from filing asylum applications, *id.* § 208.31(e) (allowing reasonable fear proceedings "for full consideration of the request for *withholding of removal only*" (emphasis added)).

## II

At *Chevron* Step One, we use "traditional tools of statutory construction" to ascertain whether "Congress had an intention on the precise question." *Hanif v. Att'y Gen.*, 694 F.3d 479, 483 (3d Cir. 2012) (citation omitted). In doing so, we "consider the text and structure of the statute in question." *United States v. Geiser*, 527 F.3d 288, 292 (3d Cir. 2008).

Cazun and the Government agree that the statute is clear, but they disagree about whose position it supports. Cazun claims she should prevail because the asylum provision states that "[a]ny alien" may apply for asylum, "irrespective of such alien's status." 8 U.S.C. § 1158(a)(1). For its part, the Government argues that Cazun is ineligible for asylum because she is subject to a reinstated removal order and the reinstatement bar says she is "not eligible and may not apply for any relief" under Chapter 12 of Title 8 of the United States Code, which includes the asylum provision. 8 U.S.C. § 1231(a)(5).

We previously found both sections at issue to be clear when read independently. We held in *Marincas v. Lewis* that "under the plain meaning of [the asylum provision], Congress clearly and unambiguously intended that the Attorney General establish a uniform asylum procedure that is to be applied irrespective of an alien's status." 92 F.3d 195, 201 (3d Cir. 1996) (disallowing unequal procedures for alien stowaways). *Marincas* does not control this appeal, however.

4

As my colleagues note, Maj. Op. at 19–21, *Marincas* did not analyze the reinstatement bar because it had not yet taken effect. After our decision in *Marincas*, in a case dealing with the reinstatement bar, we assumed in dicta that "asylum is not available to aliens who face reinstatement of a prior order of removal [under] 8 U.S.C. § 1231(a)(5)." *Gonzalez-Posadas v. Att'y Gen.*, 781 F.3d 677, 680 (3d Cir. 2015). Because neither *Marincas* nor *Gonzalez-Posadas* analyzed the interplay between the asylum provision and the reinstatement bar, this appeal requires us for the first time to "attempt to harmonize" two statutory provisions that seem, at first blush, to conflict with one another. *N.J. Air Nat'l Guard v. Fed. Labor Relations Auth.*, 677 F.2d 276, 282 (3d Cir. 1982); *see also Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and . . . it is the duty of courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

A

Our effort to harmonize these provisions begins with the text of the statute. *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 283 (2011). As the Majority notes, both provisions use the word "any," which typically has an "expansive meaning." Maj. Op. at 14 (citing *United States v. Gonzales*, 520 U.S. 1, 5 (1997)). Yet "neither section is as broad as it first seems." *Id.*

After stating that *any* alien, irrespective of status, may apply for asylum, the asylum provision then lists several exceptions preventing certain aliens from doing so in specific circumstances. *See* § 1158(a)(2). It is thus clear that *some* aliens may *not* apply for asylum. In a similar way, after the

5

reinstatement bar states that aliens with reinstated removal orders may not apply for *any* relief, the statute goes on to allow them to seek withholding of removal to certain countries. *See* § 1231(b)(3)(A). Thus, that section does not bar *all* types of relief. So neither provision is absolute, and both may be limited by other provisions. Therefore, we must turn to canons of construction and the statute's structure to see whether the two provisions can be harmonized.

B

Cazun and the Government both invoke the "specificity" canon of statutory construction. Maj. Op. at 15. Simply put, this means that a "narrow, precise, and specific" statutory provision is not overridden by another provision "covering a more generalized spectrum." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 183 (2012) (explaining that because the more specific text "comes closer to addressing the very problem posed by the case at hand[, it] is thus more deserving of credence").

Instead of challenging this canon of construction, the parties each claim that their favored provision is more specific than the other one. Although both parties provide reasonable arguments,[2] I am convinced that the reinstatement

---

[2] Justice Scalia and Mr. Garner recognize that in some cases, "it is difficult to determine whether a provision is a general or specific one." Scalia & Garner, *supra*, at 187. Sometimes two provisions may be seen as more specific each in their own way. *See id.* at 187–88 (citing *Radzanower*, 426 U.S. at 159 (Stevens, J., dissenting)).

bar is more specific than the asylum provision. While the asylum provision establishes general rules for asylum applications, the reinstatement bar deals specifically with a particular subset of illegal aliens: those who are subject to reinstated removal orders. As such, it is most naturally read as an exception to the "general permission," Scalia & Garner, *supra*, at 183, to apply for asylum. By making relief unavailable to certain aliens, the reinstatement bar nullifies every relief provision to which it applies with respect to certain persons no longer eligible for that relief.

Cazun argues that the reinstatement bar is a "blunt instrument" that is less detailed, and thus less specific, than the asylum provision. Cazun Br. 17–18. I disagree. The reinstatement bar's application to all of Chapter 12 does not defeat its specificity. When Congress raised the age at which Americans could receive full Social Security benefits, *see* Social Security Amendments of 1983, Pub. L. No. 98-21, § 201, 97 Stat. 65 (1983) (codified at 42 U.S.C. § 416(l)(1)), the law affected millions of people. But its broad applicability did nothing to dilute its specificity. In a similar way, the reinstatement bar applies to a large but specific group of people (aliens with reinstated removal orders) and deprives them of relief for which they would otherwise qualify—in this case, asylum.

As the Majority suggests, the asylum provision can also be seen as specific insofar as it deals with just one of many types of relief. Maj. Op. at 16; *see also Perez-Guzman*, 835 F.3d at 1075–76. But focusing the specificity inquiry on the type of relief available as opposed to the type of person affected creates tensions in the statute that my interpretation does not.

7

First, the reinstatement bar creates an exception from the general availability of multiple forms of relief (of which asylum is one), whereas the asylum provision simply establishes rules for asylum applications and makes them generally available to "[a]ny alien," subject to exceptions. If asylum (and every other form of relief) were deemed more specific than the reinstatement bar, all forms of relief found in Chapter 12 would be unaffected by the reinstatement bar, essentially nullifying that section in violation of another canon of construction: "the cardinal principle that we do not cripple statutes by rendering words therein superfluous." *Rojas v. Att'y Gen.*, 728 F.3d 203, 209 (3d Cir. 2013); *see also id.* at 210 ("It is our duty to give effect, if possible, to every clause and word of a statute." (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001))).

Second, creating a requirement that all forms of relief in Chapter 12 must cross-reference the reinstatement bar in order for it to apply, as Cazun recommends, would run afoul of the statutory scheme. Cazun claims that because the asylum provision enumerates some exceptions, *see* § 1158(a)(2), (b)(2)(A), but does not reference the reinstatement bar among them, Congress did not intend to make illegal reentrants ineligible for asylum. But if the reinstatement bar applied only to types of relief that cross-referenced it, it would never apply. *See* Gov't Br. 29 (noting that none of the forms of relief under the INA specifically refers to reinstatement of removal). Such an interpretation not only would render the reinstatement bar superfluous, it would also contravene the Supreme Court's observation that the reinstatement bar "generally forecloses discretionary relief from the terms of the reinstated [removal] order," *Fernandez-Vargas*, 548 U.S. at 35.

8

Indeed, the Supreme Court already recognized that Congress limited at least some types of relief via the reinstatement bar when it "held that aliens subject to reinstatement orders are ineligible for adjustments of status[] . . . [even though] the adjustment-of-status provision[ did] not mention reinstatement orders." *Ramirez-Mejia*, 794 F.3d at 490 (describing *Fernandez-Vargas*, 548 U.S. at 46–47, and 8 U.S.C. § 1255 (adjustment-of-status provision)). It so held despite the fact that the adjustment-of-status provision—like the asylum provision—does not reference the reinstatement bar among its other enumerated exceptions. Provisions like the reinstatement bar, which by their terms create exceptions from many other sections, need not list every section to which they apply, nor must they be explicitly cross-referenced in the excepted provisions. Congress may choose to limit one section of a statute via another section without an explicit cross-reference to or amendment of the section to be limited. *See id.* ("The judiciary's role is not to question the method of an amendment but only to interpret its effect.").

C

Cazun's remaining counterarguments are also unavailing.

The reinstatement bar speaks to the more specific problem Congress meant to address even if Cazun is correct that in some years those who are subject to reinstatement removal orders outnumber those who apply for asylum. As with the Social Security example mentioned previously, the numerosity of the class sheds no light on the specificity of the statute. Moreover, not every alien who submits an asylum application is subject to a reinstated removal order, which is reflected by every successful asylum applicant since 1996.

9

Thus, there are necessarily fewer asylum applications from aliens with reinstated orders than the total number of asylum applications. The class of aliens who seek asylum despite reinstated removal orders, then, is still narrower than the class of aliens who seek asylum generally.

The policy concerns created by Cazun's changed circumstances should not sway our opinion either. Congress decided to "toe[] a harder line" with respect to "illegal reentrants," *Fernandez-Vargas*, 548 U.S. at 34–35, and to discourage initial illegal entry by removing some options upon illegal reentry. And the fact that withholding of removal is available to Cazun and those like her mitigates somewhat the concerns about "dire humanitarian consequences," *Perez-Guzman*, 835 F.3d at 1081. And as my colleagues note, asylum seekers may declare themselves at the border without illegally reentering the country after they have been removed. *See* Maj. Op. at 26 n.20.

Congress's focus on illegal *re*entry would also explain the disparate treatment of aliens successfully removed previously (even if changed circumstances result) from those who have not yet been removed. *See* Maj. Op. at 25–26. It is only the former group that commits the action which triggers reinstated removal orders: "reenter[ing] the United States illegally after having been removed or having departed voluntarily." § 1231(a)(5).

## III

Because the statute is not "silent or ambiguous" as to whether aliens with reinstatement orders of removal may apply for asylum, I would enforce the statute as written rather than defer to the Agency's interpretation. *Chevron*, 467 U.S.

10

at 843. Section 1231(a)(5)—the reinstatement bar—specifically prevents the subclass of aliens of which Cazun is a member from applying for any relief under Chapter 12 of Title 8, which includes asylum. Nothing about this section is ambiguous, nor is there an implication that Congress intended a "legislative delegation to [the Agency] on [the] particular question" of the effect of reinstated removal orders. *Chevron*, 467 U.S. at 844. Unlike the "definitional issue" in *Chevron*, *id.* at 858, in which the lack of definition of "stationary source" meant that "Congress did not actually have an intent regarding the applicability of [the relevant environmental] concept to the permit program," *id.* at 845, Congress here has expressed its intent to disqualify illegal reentrants from applying for asylum, among other forms of relief.

The Majority opinion eloquently describes the facts, the question of statutory interpretation presented, and the various legal arguments made by both sides. I agree with my colleagues that the Agency's interpretation of IIRIRA is reasonable, and would join them in full if I believed this question should be decided under Step Two of *Chevron*. I concur only in the judgment, however, because I think we should end our analysis at Step One.

It is true that the apparent conflict in this case presents a difficult question of statutory interpretation, but our traditional tools of statutory construction answer it. Unless we find silence or ambiguity after employing these tools, we must answer even difficult interpretative questions. *See Scialabba v. Cuellar de Osorio*, 134 S. Ct. 2191, 2214 (2014) (Roberts, C.J., concurring in judgment) ("[D]eference is [not] warranted because of a direct conflict between [two] clauses . . . . [Statutory] conflict is not ambiguity . . . ."). The reinstatement bar singles out a subclass of aliens—illegal

11

reentrants subject to reinstated removal orders—and deprives them of various forms of relief available under Chapter 12, including asylum.

More than merely reasonable, the Agency's view that Cazun is ineligible for asylum is compelled by the statute. For that reason, I concur in the judgment.