PRECEDENTIAL


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 16-3333
_____

LUIS JAVIER MENDOZA-ORDONEZ,
Petitioner

v.

ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA,
Respondent
_____

On Petition for Review of a Decision of the
Board of Immigration Appeals
(Agency No. A202-144-002)
Immigration Judge:  Roxanne Hladylowycz
_____

Argued May 9, 2017

BEFORE:  AMBRO, RESTREPO,
and NYGAARD, *Circuit Judges*

(Filed: August 23, 2017)

Joseph A. Brophy, Esq. [Argued]
Brophy & Lenahan
18 Campus Boulevard, Suite 100
Newtown Square, PA  19073
        *Counsel for Petitioner*


Dana M. Camilleri, Esq.
Jessica Dawgert, Esq.
Sabatino F. Leo, Esq. [Argued]
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
        *Counsel for Respondent*

_____

OPINION OF THE COURT
_____

NYGAARD, *Circuit Judge.*

## I.

Luis Javier Mendoza-Ordonez, a citizen of the Republic of Honduras, crossed the United States border without inspection on two occasions.  After his first entry Customs and Border Patrol officers (CBP) detained him and

the Government returned him to Honduras under an expedited removal. When CBP detained him after his second entry Mendoza requested asylum and, alternatively, asked the Government to withhold his removal from the United States because he feared for his life if returned to Honduras.[1] He was placed into a "withholding only" proceeding and after a hearing the Immigration Judge denied his requests and ordered his removal. He appealed to the Board of Immigration Appeals (BIA) asserting, primarily, that the Immigration Judge ignored key evidence.

Mendoza now petitions us to review the BIA's order that dismissed his appeal. He contends that substantial evidence supporting his request for withholding of removal compels a conclusion that is contrary to that of the BIA. He also maintains that the BIA applied the wrong legal standard when it reviewed this claim. Finally he argues he is eligible for asylum. We will reverse the decision of the BIA and grant Mendoza's petition for withholding of removal. We will deny the petition as to his request for asylum.

II.

A.

---

[1] Mendoza requested withholding of removal under both the Immigration and Naturalization Act (INA), 8 U.S.C. §1231(b)(3)(A), and the Convention Against Torture (CAT), 8 C.F.R .§ 208.18. Of these, his petition for review raises only the denial of his request for withholding of removal under the INA.

3

Mendoza was born in Honduras in 1989, the son of Edith Dalila Mendoza Ordonez and Manuel Ulises Martinez Gonzalez.[2] Mendoza's father (Martinez) was politically active in the Liberal Party. He routinely spoke out against the National Party and its elected officials in the Honduran government. After unsuccessfully running for mayor of Apacilagua, Martinez won an election to serve as a council member for the municipality. He remained a vocal opponent of the National Party, accusing it of corruption.

Tragically, on January 1, 2000, a National Party activist named Gerardo Valladares assassinated Martinez and wounded Martinez's wife. Valladares was convicted of murder, imprisoned and released.[3] In 2002, Mendoza's uncle (Jose Avilio Martinez Gonzalez) also ran for mayor as a Liberal Party candidate; he, too, was assassinated. The man who killed him, Dimas Amador, was—like Valladares—a National Party activist.[4] Amador was convicted of this crime.

---

[2] The petitioner refers to his father as Manuel Luis Martinez-Gonzales. Martinez was married to another woman, named Bessy Magdalena Sanchez Rodriguez, when Mendoza was born. A birth certificate and Sanchez's testimony on the telephone established that Martinez was Mendoza's father.

[3] Sanchez testified that Valladares received only a six-month prison sentence. The BIA agreed with the Immigration Judge that this was insufficient evidence to substantiate the length of his prison term.

[4] Mendoza did not mention his uncle's assassination when he crossed the United States border from Mexico in either 2014 or 2015. Nonetheless, the Immigration Judge found his testimony on this event credible.

4

Throughout his childhood Mendoza attended Party functions with his father. In spite of the murders of his father and uncle, Mendoza's interest in politics persisted. He served as president of the local Liberal Party's youth division, gave speeches supporting the Party between 2008 and 2014, and worked for the Party during the national election in 2013.[5]

On September 7, 2014, Hector Giron approached Mendoza on behalf of Valladares (the assassin of Mendoza's father) and threatened him with the same fate as his father if he did not stop speaking out against the National Party. Mendoza reported this incident on the following day to Judge Miriam Umanzor Aguilar, who told him that she would investigate. Mendoza noted that Umanzor is a National Party member and the niece of the Apacilagua mayor (the same woman who defeated his father in the mayoral election). So when Mendoza heard nothing from Judge Umanzor in the two weeks following the filing of his complaint, he was convinced that the Judge would not take action. He left Apacilagua and stayed with one of his sisters in Tegucigalpa.

In October 2014, he applied for—but was denied—a visa to the United States. Nonetheless, Mendoza crossed the United States border from Mexico without inspection on November 27, 2014. CBP agents detained and interviewed him on his reasons for crossing.[6] On December 3, 2014, the

---

[5] Mendoza's friend (Oman Reuben Ouela Rodriguez) testified that Mendoza was politically active.

[6] Aspects of this interview are disputed by Mendoza, but given his admission that he is not eligible for asylum (*see infra* note 11) and the unchallenged conclusion that

5

Department of Homeland Security executed an expedited removal under 8 U.S.C. § 1225(b)(1) and returned him to Honduras.

Again, Mendoza lived with a sister in Tegucigalpa. He remained hidden there for four months, still fearing for his safety. On April 17, 2015, Mendoza traveled to Apacilagua to visit his ailing grandfather. The next day Valladares and other National Party members approached him. Valladares put a gun to Mendoza's head and told him that he would kill him if he continued to speak out against the National Party.[7] On April 20, 2015, Mendoza filed a complaint with Judge Umanzor about this new threat. When, on April 22, 2015, Mendoza heard nothing from the Judge about his complaint, he returned to his sister's house in Tegucigalpa and went back into hiding. He testified that he feared even walking the streets.

Mendoza attempted to re-enter the United States again in May 2015, but Mexican authorities detained and returned him to Honduras. He went back to his sister's house and remained in hiding until June 5, 2015. He then embarked on his last attempt to cross the United States border from Mexico. He re-entered the United States in July 2015. CBP detained him approximately six days after he crossed.

---

Mendoza's claims of politically motivated death threats are credible, these issues are not relevant to our deliberation.

[7] Rodriguez and Sanchez witnessed this and testified about it. Rodriguez also validated that the threat was grounded in Mendoza's actions on behalf of the Liberal Party.

The Department of Homeland Security determined that Mendoza was subject to removal and served him with a Notice of Intent/Decision to Reinstate the Prior Removal Order on July 28, 2015. On September 1, 2015, an asylum officer interviewed him to determine if he had credible fear of persecution in Honduras. It was determined that Mendoza's claims warranted further review, and he was referred to the Immigration Court for a "withholding only" proceeding.

B.

The Immigration Judge concluded that, although Mendoza's testimony credibly established that he received death threats for his political opinions, he still did not meet his burden of proof for withholding of removal because he failed to prove that the Honduran government was unwilling or unable to protect him from those threats. The Immigration Judge decided alternatively that the government had proven that the periods of time in which Mendoza lived with his sisters proved that he could safely relocate in Honduras. The order pretermitted his claim for withholding of removal under the INA,[8] and his asylum claim.[9] It also denied his

---

[8] The Immigration Judge did not deny, but instead pretermitted (invalidated), Mendoza's claim for withholding of removal under the INA. The BIA ruled that this was error, but it determined that the error was harmless given that the Immigration Judge reviewed the merits of Mendoza's claim for withholding of removal. However, the BIA did not explain its decision. Because we will grant Mendoza's petition for review on his withholding of removal claim arising from the INA, we clarify that, as we recently held, 8 C.F.R. § 1208.31 does not bar withholding of removal for

7

withholding of removal claim under the Convention Against Torture.[10]

Mendoza filed a timely direct appeal, claiming that the Immigration Judge erred by: deciding that he was ineligible for withholding of removal; concluding that he failed to prove the Honduran government was unwilling or unable to protect him; ruling that he could safely relocate in Honduras; deciding that he should be placed in a "withholding only" proceeding; and finally, declaring that he was ineligible for asylum. The BIA dismissed his appeal. Mendoza filed this petition for review.

### III.

### A.

Mendoza sought our review of the BIA's dismissal of his asylum claim. But he now concedes that our recent decision controls the analysis and forecloses his request for asylum. *See Cazun v. Attorney General of the United States,*

---

aliens who are under a reinstated removal order. *Cazun v. Attorney General of the United States*, 856 F.3d 249, 264 (3d Cir. 2017).

[9] Upon his second entry into the United States without inspection, the Government reinstated his prior removal order. The Immigration Judge explained in her opinion that this rendered Mendoza ineligible for asylum. 8 C.F.R. § 1208.31. We discuss this in more detail later (s*ee infra* note 11).

[10] 8 C.F.R. § 208.18.

856 F.3d 249, 260 (3d Cir. 2017).[11] The remaining action that Mendoza requests from the government arises from the INA, which says: "[T]he Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group or political opinion." 8 U.S.C. § 1231(b)(3)(A). An alien who applies for withholding of removal must prove that "'it is more likely than not that [his] life or freedom would be threatened on account of . . . political opinion.'" *Ordonez–Tevalan v. Attorney General of the United States*, 837 F.3d 331, 341 (3d Cir. 2016)( quoting *Amanfi v. Ashcroft,* 328 F.3d 719, 726 (3d Cir. 2003)); 8 C.F.R. § 1208.16(b)(1).[12] Mendoza contends that the BIA erred by ruling that he failed to prove this.

---

[11] At oral argument, Mendoza conceded that our recent decision controls the outcome on his asylum claim (*Cazun,* 856 F.3d 249), and tacitly recognized the propriety of the decision to adjudicate his case in a "withholding only" proceeding. Mendoza argued, as did the petitioner in *Cazun*, that, in light of 8 U.S.C. § 1158(a), the BIA unreasonably interpreted 8 U.S.C. § 1231(a)(5) as barring asylum relief to those under a reinstatement of a removal order. However, we ruled that "[i]t was reasonable for the agency to conclude that the statutory reinstatement bar foreclosing 'any relief under this chapter' means just what it says: no asylum relief is available to those subject to reinstated removal orders." *Cazun,* 856 F.3d at 260. Our holding in *Cazun* controls the issue raised by Mendoza, and for this reason, we will deny his petition for review on this claim.

[12] Mendoza did not challenge the BIA's decision denying his claim for withholding of removal under the Convention

We have jurisdiction to review the BIA's final order of removal under 8 U.S.C. § 1252(a). When, as in this instance, the BIA provides its own reasoned decision (rather than merely adopting the immigration judge's opinion) we review the BIA's decision as the final decision. *Nelson v. Attorney General of the United States,* 685 F.3d 318, 321 (3d Cir. 2012). Nonetheless, "to the extent the BIA deferred to or adopted the [immigration judge's] reasoning" on particular issues, we may consider both opinions on those points. *Id.* We are empowered to review the BIA's legal conclusions under a de novo standard of review. *Borges v. Gonzales,* 402 F.3d 398, 404 (3d Cir.2005). But we must regard all determinations about facts grounding the final order as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Factual findings include statements about the events and circumstances in the country grounding an alien's claim that he or she suffered persecution. *Kaplun v. Attorney General of the United States*, 602 F.3d 260, 270 (3d Cir. 2010).[13]

Mendoza alleges the BIA made two errors. First, he contends the entire record compels a result contrary to BIA's finding that he failed to produce sufficient evidence to support his request for withholding of removal. He also

Against Torture, nor did he object to the BIA's denial of his withholding of removal claim under the INA that was based on his membership in a social group.

[13] The determination of whether the events and circumstances alleged rise to the level of persecution is a legal determination that the BIA decides de novo. *Kaplun*, 602 F.3d at 270.

10

claims that the BIA applied the wrong standard of review when it analyzed his argument that the Immigration Judge ignored key evidence. We will address this latter issue first.

B.

The BIA is required to examine challenges to the immigration judge's factual findings for clear error. 8 C.F.R. § 1003.1(d)(3)(i). Clear error is commonly defined as "an obvious, plain, gross, significant, or manifest error or miscalculation." *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 653 (1993).

In his petition for review Mendoza says that the BIA failed to use the clear error standard when it reviewed his appeal. The Government agrees that clear error review applies, and points out that the BIA correctly referred to it early in its opinion. This is true, but later in its discussion of the country reports, the BIA also said:

> [Mendoza] did not establish that this evidence is sufficient to impact the outcome of the case. . . . *See Matter of Coelho*, 20 I&N Dec. 464 (BIA 1992)( holding that an alien seeking to reopen or remand proceedings bears a heavy burden of proving that the new evidence offered would likely change the result of the alien's case).

11

The BIA's error is readily apparent. It should have been examining, in the context of a direct appeal: whether the Immigration Judge failed to review and weigh the country reports that were in the record; and, if she did ignore the reports, whether this error undermined her factual finding about the Honduran government's willingness and ability to protect Mendoza from death threats. Instead, mistakenly applying the standard for a motion to remand or reopen, the BIA deliberated on: whether these reports were significant enough to warrant consideration as new evidence (as though they were not already part of the record); and whether the reports provided a sufficient basis to reopen the case.[14]

Yet, even though we are confident the BIA made a mistake, we are less certain about the impact it had on its decision. Because the BIA's discussion of the reports is so brief, we do not know exactly how it analyzed them. It is also impossible to gauge whether its treatment of the reports as new evidence prejudiced its assessment of them in any way. For these reasons we cannot assess the precise impact that the BIA's error had on its conclusion. Nonetheless, we do not need to pursue this issue further because, when the entire record is considered, we are certain Mendoza's substantial evidence claim has merit.

C.

---

[14] *Matter of Coelho* addresses a motion to remand that sought the consideration of new evidence. It followed its practice of regarding the motion as if it was a motion to reopen. *Matter of Coelho*, 20 I. & N. Dec. at 471.

Our review for substantial evidence does not merely rest on our discovery of alternative theories or findings that could be supported by the record. Rather, it requires that we examine the entire record to decide whether this body of evidence would compel a reasonable factfinder to make a determination contrary to that made by the BIA. *He Chun Chen v. Ashcroft*, 376 F.3d 215, 223 (3d Cir. 2004).[15]

We begin by noting that the BIA accepted the Immigration Judge's credibility determinations on key facts in Mendoza's petition. The BIA did not disturb the Immigration Judge's conclusion that Mendoza received two death threats in 2014 and 2015. It accepts that these threats originated with the same man who killed his father in 2000. The BIA did not express any problems with the notion that the threats were due to Mendoza's political activity. And it agrees that Mendoza made complaints to Honduran authorities and that nothing resulted from them.[16] But since the death threats directed at Mendoza did not come from someone within the government, the BIA properly focused on whether Mendoza had shown that the Honduran government was unwilling or unable to protect him from the threats. *Lie v. Ashcroft*, 396 F.3d 530, 537 (3d Cir. 2005). It ultimately

---

[15] "'Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Senathirajah v. Immigration & Naturalization Service,* 157 F.3d 210, 216 (3d Cir. 1998)( quoting *Turcios v. Immigration & Naturalization Service*, 821 F.2d 1396, 1398 (9th Cir. 1987)).

[16]The BIA stated that "the Immigration Judge properly 'found that' nothing resulted from the applicant filing two complaints. . . ."

ruled that he did not provide enough evidence on this essential piece of his case and therefore he did not prove his eligibility for withholding of removal.

To prove his eligibility, Mendoza gave the Immigration Judge evidence about the death threats, the political affiliation of Valladares and Judge Umanzor, and country condition reports from a variety of sources. But the Immigration Judge never acknowledged the reports. Moreover, although the BIA made a ruling based on its review of the reports, it did not explain what was in them. Therefore, we will address what we found in our review that was relevant to Mendoza's petition.

A 2013 article from Rights Action states that, after the National Party came into power in 2009, violence related to the electoral process in Honduras steadily rose. It also saw an increase in the number of politically motivated deaths. It commented that violence had been directed at Liberal Party members. A.R. 336. A 2013 State Department Human Rights Report described the 2013 elections as credible but concluded that the justice system suffers from "institutional weakness," subjecting it to corruption and intimidation. It referred to a number of instances in which military or police officials who were suspected of violating human rights were not prosecuted. A.R. 375. A 2014 State Department Human Rights Report discussed government efforts to combat corruption, but it also highlighted significant institutional and societal challenges that hampered the success of its efforts. A.R. 421. It noted particular "concern regarding corruption in the judiciary and security forces." A.R. 420. A 2015 Human Rights Watch report said that the system for selecting judges in Honduras had many irregularities, and it reasoned

14

from this that the system generally lacked the protections necessary to guard against political interference. A.R. 326. Finally, a Freedom House report from 2015 stated that roughly 80% of the crimes occurring in the country are never reported, and that police actually investigate only 4% of crimes that are reported. A.R. 332. All of the reports included discussion of widespread corruption and violence in Honduras, and described an environment in which civil rights protections are eroding.

Since the BIA did not discuss the substance of these reports, we look to other aspects of its opinion to understand why, even with this evidence, it ruled that Mendoza did not carry his burden of proof. Three aspects of its decision were prominent.

First, the BIA referenced the convictions of Valladares in 2000 and Amidor in 2002 (the men who assassinated Mendoza's father and uncle) ostensibly to show that the Honduran government does investigate and prosecute politically motivated violence. The BIA obliquely acknowledged that this evidence pre-dated (by over a decade) the death threats Mendoza received. However, it implied that Mendoza failed to show that conditions in the country had grown worse in that period of time.[17]

---

[17] The BIA did not explicitly state that Mendoza failed to prove a change in conditions in Honduras. Instead, as part of its discussion rejecting Mendoza's assertion that Valladares had received a short prison sentence, it said: "[W]e conclude that the applicant did not submit sufficient testimonial or documentary evidence to establish that the length of time that his alleged persecutor was imprisoned *and the passage of*

15

In response to Mendoza's Petition for Review, the Government defended the BIA's assessment of the relationship between the convictions (of Valladares and Amidor) and the country reports with a different line of reasoning. It brushed aside the country condition reports as nothing more than Mendoza's misguided attempt to "override" evidence of the convictions of Valladares and Amidor. *Menjivar v. Gonzales*, 416 F.3d 918, 922 (8th Cir. 2005) ("To whatever extent these materials show that there is a general problem of gang violence . . . we do not believe they can override the evidence in this case that police conducted a thorough investigation. . . ."); *Matter of McMullen*, 17 I. & N. Dec. 542, 546 (BIA 1980) ("We do not give much weight to those articles submitted by the [alien] which are of a general nature and do not in any way relate to the [alien] himself."). The implication is that, in the face of direct evidence of convictions, country condition reports have little weight.

A second aspect of the BIA's decision we regarded as important was its perspective on the fact that Mendoza's assertion of past persecution relies on an inference of political corruption that is grounded in the Honduran government's

---

*time since his imprisonment establishes that the government of Honduras is unable or unwilling to protect him.*" In context, we understand this to express the BIA's conclusion that Mendoza failed to prove that the political and legal environment in Honduras (which, it implies, enabled the conviction of his father's assassin) had deteriorated.

inaction on his complaints.[18]  The BIA dismissed Mendoza's inference as pure speculation by concluding generally that the evidence does not support the notion that the Honduran government was unwilling or unable to protect him.  It also specified that even the "background evidence" (a reference to the country condition reports) does not change this outcome. The BIA underscored its assessment that evidence supporting Mendoza's inference is weak by proffering, albeit in an off-hand manner, an alternative inference drawn from the Honduran government's inaction on his complaints that the government's inaction was due to Mendoza's impatience.[19]

The Government defended the BIA's reasoning by referencing precedent in which we ruled that the Honduran government's failure to act on complaints of threats did not necessarily show that it had been unwilling or unable to respond to an alien's complaints of violence and threats by

---

[18] The Government asserts that the Immigration Judge made a finding that Mendoza failed to prove the Honduran government did not act.  In fact, the Immigration Judge equivocated, saying she "hesitates to make the same assumption [as Mendoza did] that the courts were not going to do anything."  She said nothing further on this.  Our analysis is grounded in the BIA's conclusion that "nothing resulted" from Mendoza's complaints.

[19] It said that "although nothing resulted from the applicant filing two complaints against the man who threatened him[,] the applicant waited only a short period of time after filing the complaints before assuming that nothing would be done about the complaints. . . ."  The BIA also said it was Mendoza's impatience—demonstrated by him leaving Apacilagua two weeks after the first complaint and two days after the second complaint—that prevented any investigation from occurring.

gangs.  *Valdiviezo-Galdamez v. Attorney General of the United States,* 663 F.3d 582, 610 (3d Cir. 2011).  That case, which focused on gang violence, relied on 2005 country reports that documented the Honduran government's reform efforts, such as new security patrols, and anti-gang legislation.  *Id.*  We concluded that those reports weakened the alien's attempt to use inaction on his complaints as a basis to infer the government's unwillingness or inability to protect him.  We noted that, lacking strong supporting evidence, numerous reasonable inferences could be made from the Honduran government's inaction that would not support the alien's claims.  *Id.*

The third, and final aspect of the decision that was of particular interest to us was the BIA's judgment that it did not need to address an alternative decision by the Immigration Judge.[20]  The Immigration Judge decided on alternative

---

[20] We may address rulings by the Immigration Judge "to the extent the BIA deferred to or adopted the [immigration judge's] reasoning" on a particular issue.  *Nelson,* 685 F.3d at 321.  Here the BIA found no need to rule on the Immigration Judge's decision that the Government carried its burden of proving that Mendoza could safely relocate.  It did so because it agreed with the Immigration Judge's underlying reasoning that the record was insufficient to ground the prerequisite finding that the Honduran government was unwilling or unable to protect Mendoza.  This obviated the need for a determination that Mendoza could safely relocate because the BIA's ruling implicitly determined this.  Our review encompassed the entire record that was before the Immigration Judge and the BIA.  Moreover, our findings on this record (arising from other issues, *see infra*)

grounds that, even if Mendoza had established past persecution, the government nonetheless met its burden of proof to show that he could safely relocate to Honduras. (8 C.F.R. § 208.16(b)(3)(ii)). The Immigration Judge was convinced that, since Mendoza lived with his sisters for a period of time after the death threats without any incident, this was sufficient evidence to show that safe relocation was possible. She noted, however, that her finding also was grounded in her assessment that Mendoza failed to substantiate his claim that he was fearful after the death threats or that he needed to go into hiding when he was staying with his sisters. The BIA's ruling that Mendoza did not prove the Honduran government's unwillingness or inability to protect him implicitly adopts this reasoning, which obviated the need for an explicit ruling that Mendoza could safely relocate there.

Although these three aspects of the decision give us an idea of how the BIA viewed Mendoza's petition, we nonetheless are baffled by its assessment that the country reports were unimportant to the outcome of the case. To the contrary, we regard the evidence in these reports as a critical piece of the record.

The BIA raised up the convictions of Valladares and Amidor as affirmative evidence of a properly functioning justice system that contradicts Mendoza's claims. Although evidence of country conditions around the time of those

fundamentally contradict the Immigration Judge's reasoning and ruling, and they also eliminate any basis for the BIA's implicit ruling that Mendoza can safely relocate. Therefore, we may review the Immigration Judge's ruling on this issue.

19

convictions is not in this record, the reports Mendoza submitted give us a substantive understanding of conditions in Honduras when he received the death threats: widespread human rights abuses; unchecked politically motivated violence; and a poorly functioning justice system, vulnerable to corruption, that failed to reign in the violence. As a result, we are convinced that convictions occurring more than a decade before the death threats have little value in the context of the entire record. The convictions do not contradict or even diminish evidence portraying fundamentally different country conditions at the time of the threats.[21] Therefore, we conclude that—in light of this entire record—the BIA's reliance on the convictions of Valladares and Amidor to form conclusions about country conditions at the time of the death threats was not reasonably grounded in the record and is not owed our deference.

Similarly, the BIA implies that—like *Valdiviezo-Galdamez*—the record is too weak to support an inference that the justice system is corrupt and biased. However, Mendoza grounded his inference by testifying that Valladares and Umanzor belong to the National Party, and by testifying that Umanzor is the niece of the woman who was a political opponent of Mendoza's father. This testimony was not challenged. He then pointed to the country reports. One report noted that only a small fraction of crimes brought to the government are ever investigated. A second report discussed a justice system that is systemically vulnerable to

_____

[21] Unlike *Menjivar,* these reports were not general in nature, but rather provided analysis that gave close support to the claims Mendoza made about problems with the Honduran justice system. *Menjivar*, 416 F.3d at 922.

political influence and corruption. Finally, another report documented that the Honduran government failed to prosecute officials who were known to have committed human rights violations. This was only a small part of the country condition evidence presented that supported his claims. These country reports demonstrate that Mendoza's experience (threats of violence that receive no government response or investigation) was by no means an isolated case. All of this provides a compelling grounding for his inference that the inaction on his complaints was due to the shared political affiliations of the perpetrator and the Judge, and a justice system that allows and enables such corruption by political influence.[22]

Finally, as to the Immigration Judge's observation, implicitly endorsed by the BIA, that Mendoza did not legitimate his fear or his need to go into hiding, we regard this conclusion as contrary to the record. As we have already stated, after establishing that he faced death threats, Mendoza provided evidence of a systemic problem with the justice system that was not unique to Apacilagua. The reports made clear that politically motivated violence, virtually unrestrained, was a reality that afflicted the entire country.

---

[22] As for the BIA's alternative inference regarding Mendoza's impatience, we generally defer to inferences made by the immigration judge or BIA. But deference is not owed when the inference is not reasonably grounded in the record "as a whole." *Tarrawally v. Ashcroft*, 338 F.3d 180, 184 (3d Cir. 2003). In this instance, there is absolutely nothing in the record to support the BIA's theory that impatience explains the government's inaction. It is, therefore, not entitled to our deference.

Therefore, in the context of the entire record, Mendoza's fear and his need to go into hiding have been amply and compellingly substantiated.

Throughout this review of the BIA's decision, we have been aware that the deferential "substantial evidence" standard of review establishes a high bar for disturbing the factual conclusions of the BIA. Moreover, we know that—even when we come across evidence in the record that would compel a different finding—"the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). This would ordinarily be the case particularly where, as here, the BIA's analysis of key evidence is scant. Nonetheless, there are a few instances in which "'application of the correct legal principles to the record could lead only to the same conclusion'" and in these rare cases "'there is no need to require agency reconsideration.'" *Kang v. Attorney General of the United States,* 611 F.3d 157, 168 (3d Cir. 2010) (quoting *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alterations omitted)). This is such a case.

In this instance, we are convinced that evidence of the politically motivated death threats, the inaction on Mendoza's complaints, a perpetrator and judge who shared a political affiliation in opposition to that of Mendoza, and evidence of a politically corrupt justice system that failed to reign in politically motivated violence in Honduras compels two findings: first, the Honduran government was unwilling or unable to protect Mendoza from death threats; and, second, Mendoza could not safely relocate in Honduras. These findings, in turn, lead only to one reasonable conclusion: "'it

22

is more likely than not that [Mendoza's] life or freedom would be threatened [in Honduras] on account of . . . political opinion.'" *Ordonez–Tevalan*, 837 F.3d at 341 (quoting *Amanfi,* 328 F.3d at 726); 8 C.F.R. § 1208.16(b)(1). For this reason, we conclude that this case is one of those rare instances in which remand is not necessary. The record compels a conclusion that withholding of removal should be granted, and we will do so.

## IV.

For all of these reasons, we will reverse the BIA's decision and grant Luis Mendoza Ordonez's petition for withholding of removal, pursuant to 8 U.S.C. § 1231(b)(3)(A). We will deny the petition for review on the request for asylum.

23