NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1323
_____

JOSE SOLANO-CHAMBA,
a/k/a Jose Luis Solano Chamba,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
Respondent
_____

On Petition for Review of a Decision of the
United States Department of Justice
Board of Immigration Appeals
(A208-558-362)
Immigration Judge:  Elise Manuel
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
January 14, 2019
_____

Before: GREENAWAY, JR., SHWARTZ, and PORTER, *Circuit Judges*.

(Opinion Filed:  March 1, 2019)

OPINION[*]

GREENAWAY, JR., *Circuit Judge.*

This case arises from a petition for review filed by a native and citizen of Ecuador who argues that the Board of Immigration Appeals [hereinafter "the Board"] wrongly denied his applications for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). For the reasons set forth below, we will grant the petition as to the asylum and withholding of removal claims and remand for further proceedings, but deny as to the claim for relief under the CAT.

## I. Background

### A.

Jose Luis Solano-Chamba entered the United States on October 16, 2015, allegedly seeking to escape the reach of a drug cartel, headed by a fellow known as El Piojo. Pursuant to 8 U.S.C. § 1182(a)(6)(A)(i), the United States Department of Homeland Security charged Solano-Chamba as removable because he was present in the United States without being admitted or paroled. Solano-Chamba appeared before an immigration judge ("IJ") and conceded that charge on May 9, 2016. But he sought relief

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

from removal in the form of asylum under 8 U.S.C. § 1158, withholding of removal under 8 U.S.C. § 1231(b)(3), and protection under Article III of the CAT. The IJ held a hearing on February 28, 2017, at which, in support of his claim for relief, Solano-Chamba testified to the effect of the following:

He was born and raised in La Victoria, Ecuador, but later moved to the city of Huaquillas—which sits on the border of Ecuador and Peru. While there, he purchased a car, and became a taxi driver. He transported passengers both in and around Huaquillas, and across the border to Peru. In so doing, Solano-Chamba made one and a half to almost two times as much as he had in his previous job as a mine worker in La Victoria.

The work soon brought its own troubles, however. Specifically, because Solano-Chamba crossed the border so often—multiple times a day—the officials stopped subjecting him to routine checks of his vehicle and his credentials. That access caught the attention of El Piojo. In Solano-Chamba's view, El Piojo operated with impunity— he had been the subject of numerous complaints related to drugs, crimes, and violence, but had never been apprehended.

Solano-Chamba encountered El Piojo on two occasions, one directly and the other in passing. The latter took place in May of 2015, when Solano-Chamba observed El Piojo "in a very pleasant manner having lunch with some officers." A.R. 204. The former took place on the night of September 10, 2015, when El Piojo jumped into Solano-Chamba's taxi. While in the taxi, El Piojo identified himself and told Solano-Chamba that he wanted him to transport some merchandise—"some drugs"—between the

3

borders, and explained why it would be "very easy" for Solano-Chamba to do so.  A.R. 205.  Solano-Chamba refused, expressing that he was pleased with his life and work and did not want to get mixed up in illicit activities.

El Piojo took exception.  He immediately ordered Solano-Chamba to "stop" and later warned Solano-Chamba to "keep [his] mouth shut."  A.R. 206.  El Piojo followed with an additional warning that if Solano-Chamba had a complaint against him "with the immigration or the police . . . he was going to look for [Solano-Chamba], he was going to destroy [Solano-Chamba's] car and . . . kill [him]."  A.R. 206.

El Piojo exited the vehicle thereafter.  Solano-Chamba was very scared.  He parked his car in the usual place and went home, where, out of fear, he remained the following day.  When he returned on September 12, 2015, the first of El Piojo's threats had been carried out:  Solano-Chamba found his car "completely destroyed with the windows broken," and tires flat.  A.R. 206.  He also found a note that accused him of being a "rat," and a "talker and that no matter where [he] would go, [El Piojo] was going to look for [him] . . . make [him] pay and . . . kill [him]."  *Id*.

At the time, Solano-Chamba thought that El Piojo's actions were motivated by his strong refusal to assist El Piojo's criminal enterprise.  He called his landlady in Huaquillas to ask if anyone had come looking for him.  When she said no one had, he filled a bag with clothes and took a bus to La Victoria, where his parents lived.  He remained there for several days, until he received a call on September 17.  The call was from El Piojo—he told Solano-Chamba that he knew where Solano-Chamba was, where

4

his parents lived, and that "no matter where [Solano-Chamba] would go," he was going to find him and make him pay for everything. A.R. 208. Solano-Chamba does not know how El Piojo found his number, but conjectures that it may have been from one of his passengers.

Solano-Chamba contacted the police in La Victoria to no avail: he told them that he wanted to file a complaint because he had received a death threat, to which they responded that he needed to make an appointment so that they could come out and get a statement from him. That was supposed to take place within one or two days, but never occurred. Solano-Chamba called them again, but the station never answered. He waited until September 20, at which point he decided he would need to flee Ecuador.

In preparation to leave, he contacted his landlady in Huaquillas and asked her if she wanted to purchase the items in his apartment and what remained of his car. In that conversation, Solano-Chamba learned that, on the same day that El Piojo entered his taxi, officials "had detained merchandise of drugs between the front borders of Peru and Ecuador," and that it was from "workers of El Piojo." A.R. 211. She also told Solano-Chamba of rumors that somebody "put a complaint against El Piojo," and that complaint was "the reason" the immigration officers detained El Piojo's workers. *Id*. She asked if Solano-Chamba was the one who filed the complaint.

Solano-Chamba left Ecuador the next day, on September 21, 2015. He crossed the countries of Peru, Nicaragua, Honduras, Guatemala, and Mexico, and was immediately detained after he crossed the U.S.-Mexico border.

5

**B.**

The IJ found this testimony credible as to Solano-Chamba's "own experiences and subjective fears and concerns," commenting that "[the testimony] was consistent with the evidence in the record, . . . the country conditions information . . . , and it was internally consistent." A.R. 156. She nonetheless denied his application for asylum, withholding of removal, and relief under the CAT. The Board affirmed. Solano-Chamba filed this petition for review of the Board's final order of removal.

## II. Jurisdiction & Standard of Review

We have jurisdiction to review the Board's order under 8 U.S.C. § 1252(a). *Mendoza-Ordonez v. Att'y Gen. of U.S.*, 869 F.3d 164, 168 (3d Cir. 2017). Our review is limited to the reasons provided by the Board. *See Orabi v. Att'y Gen. of U.S.*, 738 F.3d 535, 539 (3d Cir. 2014) (citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947) [hereinafter, "*Chenery I*"] and *Li v. Att'y Gen. of U.S.*, 400 F.3d 157, 163 (3d Cir. 2005)). But we may also consider the IJ's opinion where the Board adopted or deferred to the IJ's reasoning. *Mendoza-Ordonez*, 869 F.3d at 169 (citing *Nelson v. Att'y Gen. of U.S.*, 685 F.3d 318, 321 (3d Cir. 2012)). We review constitutional issues and questions of law under a *de novo* standard, and regard the Board's factual determinations as "conclusive unless any reasonable adjudicator would be compelled to conclude the contrary." *Id.* (citations and internal quotation marks omitted).

## III. Asylum

6

To demonstrate eligibility for asylum, a petitioner is required to show that he or she suffered persecution, or harbors a well-founded fear of persecution, and that such persecution or feared persecution is on account of one of the statutorily enumerated grounds of race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. §§ 1158(b)(1)(B)(i), 1101(a)(42)(A). Should a petitioner base his or her claim on membership in one or more particular social groups, said petitioner must establish that (1) the particular social group in question is legally cognizable, (2) he or she is in fact a member of that group, (3) was persecuted, or harbors a well-founded fear of persecution, which is subjectively genuine and objectively reasonable, and (4) a nexus, or causal link exists between the persecution and his or her membership in the particular social group. *S.E.R.L. v. Att'y Gen. of U.S.*, 894 F.3d 535, 544 (3d Cir. 2018) (citing *Fatin v. I.N.S.*, 12 F.3d 1233, 1240 (3d Cir. 1993)). To be considered legally cognizable, the group proffered by the petitioner must be (i) composed of members who share a common, immutable characteristic, (ii) defined with particularity, and (iii) socially distinct within the society in question. *See S.E.R.L.*, 894 F.3d at 540.

Thus, ordinarily, when a petitioner seeks asylum on the basis of membership in one or more particular social groups, the IJ conducts an independent analysis for each group. He or she first assesses whether the social group alleged is legally cognizable; then whether the petitioner is in fact a member; followed by whether persecution or a well-founded fear of persecution has been established; and finally, whether the requisite causal link has been shown.

7

Solano-Chamba's asylum claim was based on the alleged persecution he suffered as a member of two particular social groups. The IJ modeled the above framework with respect to Solano-Chamba's first proposed social group, but deviated as to the second, opting not to first assess whether the second group was legally cognizable. The Board in turn operated under the mistaken impression that the IJ in fact made the cognizability assessment as to the second group. As a result, we are left with no ruling from the Board as to the cognizability of that group. Hence, for the reasons detailed below, we will grant the petition and remand for the Board to make a ruling as to whether Solano-Chamba's second proposed group is legally cognizable.

## A.

Solano-Chamba argued to the agency that he demonstrated credible fear of persecution on account of his membership in two particular social groups: the first composed of "men who by virtue of their profession are targeted by drug cartels to transport drugs across the border," and the second of "persons who[m] the drug cartel suspects of reporting their illegal activities to the police." A.R. 194, A.R. 3. The government argues that neither group is legally cognizable, so that should be the end of the matter. But, as it pertains to the second proposed group, we are not persuaded that the Board rested its decision on that ground.

That is critical because when one subject to a final removal order petitions our Court, we do not exercise the usual appellate jurisdiction we would over a district court decision. *See Ming Dai v. Sessions*, 884 F.3d 858, 868–69 (9th Cir. 2018) (citing 8

U.S.C. § 1252(a)(5) ("[A] petition for review . . . shall be the sole and exclusive means for judicial review of an order of removal . . .")). Rather, the petition filed institutes a new action against the United States, consisting of judicial review of the Board's actions and determinations. *Id.* at 868. In that posture, the broad license we have to affirm a district court decision on any basis supported by the record is narrowed—we are confined to the reasons provided by the Board. *See Orabi*, 738 F.3d at 539 (rejecting the government's position that the petitioner withdrew an appeal of his conviction because "[the Board did not base its decision on [that finding] . . .").[1]

Here, the IJ held that the first group was not cognizable because it was "not particularized" and was "circularly" defined "by the alleged persecutory behavior." A.R. 157. The IJ also found that the behavior complained of—targeting by the cartel—did not constitute persecution. The Board affirmed, adding its own analysis that the group was not cognizable because the members did not share a common, immutable characteristic. A.R. 4 (citing *Matter of Acosta*, 19 I & N. Dec. 211 (BIA 1985), and stating, "[A]

---

[1] The limitation stems from the principle enunciated in *Chenery I*, which is that, in dealing with a determination or judgment which an administrative agency alone is authorized to make, [a reviewing court] must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.

332 U.S. at 196; *see also I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16–18 (2002) (deriving from that principle what is now termed the 'ordinary remand rule' and applying that rule in the context of the Board's authority to make the decision as to an issue regarding asylum eligibility).

9

profession or occupation (such as taxi driver) cannot form the basis of a particular social group because it is not an immutable characteristic").[2]

But the IJ took a different course for the second group. Without first assessing whether a group of "persons who the drug cartel suspects of reporting their illegal activities to the police" was legally cognizable, the IJ held that Solano-Chamba's claim must fail because the evidence did not establish that he was a member of that group. A.R. 158 ("Some Courts have found that persons who are actually witnesses in criminal proceedings may be considered members of a particular social group, but I do not find that the evidence provided today establishes that that group was a group that the respondent was a member of in this case.").

The Board again affirmed, this time purporting to adopt the IJ's analysis. Indeed, perhaps under the mistaken impression that the IJ had followed the usual analytical paradigm, the Board stated, "We agree with the [IJ] that the respondent's second group is not cognizable because it is not particular and it is impermissibly defined by its alleged harm." A.R. 4. The government argues that statement constitutes the Board "properly agree[ing] with the immigration judge that Solano-Chamba's [second] proposed group" is not legally cognizable. Appellee Br. 24.

We disagree—the Board's decision deprives us of a cognizability determination to review for the second proposed group. First, contrary to what the Board's statement

---

[2] Solano-Chamba does not contest the Board's ruling as to this group.

10

suggests, the IJ made no ruling with respect to the second group's cognizability. Second, the Board's purported points of agreement with the IJ—that the group is not particular and impermissibly defined by its alleged harm—mirrors the rationale the IJ provided for rejecting the first proposed group. The attendant ambiguities render the Board's statement—the only one referencing the cognizability of Solano-Chamba's second proposed group—insufficient to serve as a ruling by the Board. Indeed, to the extent that the Board sought to adopt the IJ's rulings, it failed because the IJ made no such ruling. If the Board intended to make an independent ruling, its statement begs the question: was it in fact analyzing the second group or did it confuse the two? That question is all the more concerning when, as we discuss in section III.B, the nexus finding the Board purports to adopt from the IJ as to the second group was in fact a finding that the IJ had made only as to the first.

We therefore cannot affirm the Board's decision on the ground that Solano-Chamba's second proposed particular social group is not legally cognizable. *See Kayembe v. Ashcroft*, 334 F.3d 231, 234 (3d Cir. 2003) (concluding that the Board's failure to adopt or defer to the IJ's finding on an issue meant that there was nothing to review as to that issue) (citing *Abdulai v. Ashcroft*, 239 F.3d 542, 555 (3d Cir. 2001)).

**B.**

In the alternative, the government proffers that Solano-Chamba's asylum claim must be denied because he has not shown that a causal link exists between his alleged persecution and a statutorily protected ground. The government makes that argument

11

against the backdrop of the Board's express adoption of the IJ's rulings that the evidence did not establish that Solano-Chamba was a member of the second proposed social group, and that the cartel's efforts to recruit him were not on account of his membership in any social group, but rather an effort to advance their enterprise.[3] We again disagree. On the record before us, any reasonable adjudicator would be compelled to reach a conclusion contrary to that of the Board on each of these points. In reaching that conclusion, it bears mention that we state no position as to whether Solano-Chamba's second proposed group is in fact legally cognizable—that is for the Board to determine on remand. Rather, we assume the group's cognizability for the purposes of this analysis, consistent with the approach effectively taken by the Board, and expressly employed by the IJ.

On membership in a particular social group, the Board predicates its ruling on its assessment that Solano-Chamba's claim that El Piojo suspected him of reporting the cartel's illegal activities to the police was "speculative and not based on fact." A.R. 4. The Board does not elaborate, but the IJ made the exact same finding. She found the evidence supporting Solano-Chamba's claim to be speculative for five reasons: first, "in [Solano-Chamba's] phone conversation with El Piojo, El Piojo never said, we think you denounced us"; second, Solano-Chamba's belief was based "on his conversation with the

---

[3] Solano-Chamba urges that we rule that he suffered past persecution at the hands of El Piojo, and that he harbors a well-founded fear of future persecution. Appellant Br. 34–35. However, the Board's decision makes no mention of the IJ's ruling on these points. It would thus be premature to address them when the second group's cognizability is unresolved.

12

landlady"; third, "[he] never did make a police report"; fourth, the arrest carried out by border officers "was not the result of any information [he] provided"; and fifth, he did not contact those same officers thereafter "to provide any information to them or to report the threats that he had received." A.R. 158–59. Solano-Chamba is correct that, as a collective, these findings appear to overlook key facts, mischaracterize others, and otherwise miss the point of the inquiry.

The latter is true of reasons three through five. Solano-Chamba's burden was to demonstrate that the drug cartel suspected him of having reported criminal activity to the police. That does not require his having actually reported said activity. It does not require arrests to have resulted from information he provided. And it certainly does not require him to have provided information after an arrest was made.

Similarly, that El Piojo did not say the magic words "we think you denounced us" is hardly dispositive on the question of whether Solano-Chamba was suspected of doing so. *See Sorrano-Alberto v. Att'y Gen.*, 859 F.3d 208, 224 (3d Cir. 2017) (rejecting nexus determination and remanding where "the IJ, without making any adverse credibility determination, found that nothing in the record suggests that [the petitioner] was the intended victim of [the shootings] . . . and, remarkably, rested her conclusion . . . on her observation that the drive-by shooters . . . did not stop to tell him the reason why they were shooting at him[.]") (citations and internal quotation marks omitted). Nor is it the case that Solano-Chamba's belief was solely based on his conversation with the landlady. Indeed, by the time that conversation took place, El Piojo had made good on two of the

three threats he made to Solano-Chamba after circumstances that would warrant El Piojo's belief that someone had reported his activities to the police. Specifically, El Piojo threatened that if Solano-Chamba failed to keep his mouth shut, he, El Piojo, would find Solano-Chamba, destroy his car, and take his life. By the time his landlord told him about the alleged arrest, Solano-Chamba was preparing to leave Ecuador because his car had been destroyed, and he had been found despite fleeing to his parents' home.

Moreover, with El Piojo's threat in mind, one would be hard-pressed to conclude that a note which called Solano-Chamba a "rat," and that was left on his destroyed car meant anything other than that whoever left the note suspected Solano-Chamba of having engaged in "rat"-related activity. In this context, said activity certainly reflects that someone suspected Solano-Chamba of having reported to the police. The same is true of a direct phone call from El Piojo, in which El Piojo calls Solano-Chamba a "rat" and again threatens to find and kill him.

The above evidence would compel any reasonable adjudicator to conclude that Solano-Chamba is a member of a group composed of persons whom the drug cartel suspects of reporting their illegal activities to the police.

On nexus, asylum applicants bear the burden of providing "some evidence," "direct or circumstantial," of a motive based on their alleged statutorily protected ground. *Ndayshimiye v. Att'y Gen. of U.S.*, 557 F.3d 124, 131 (3d Cir. 2009) (quoting *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483 (1992)). On this issue, the Board purports to agree with the IJ that "El Piojo targeted [Solano-Chamba] not on account of his membership in

14

the second particular social group, but rather based on ordinary criminal activity." A.R. 4. However, as we alluded to earlier, that is in error. The IJ never made this finding with respect to Solano-Chamba's second proposed social group, only the first. A.R. 169 (referring to the first proposed group, and stating, "I do not find that this is persecution on account of . . . membership in the group because the motivation was purely criminal.").

For the second group, the only statement by the IJ that can be remotely construed as a nexus finding is the remark that "even if the group were cognizable as persons who are suspected of providing information to the police, [Solano-Chamba] has not shown that he was targeted for that reason." A.R. 171. But, when examined closely, that statement is merely a recycling of the IJ's finding in the preceding paragraph that Solano-Chamba could not establish membership in the group, since he could not show that he was in fact suspected of having reported criminal activity. *See* A.R. 170. The import of the Board's error is borne in the standard of review it applied to this purported finding by the IJ. Again under the mistaken impression that the IJ ruled on the issue of the perpetrator's actual motive, the Board reviewed the ruling for clear error pursuant to 8 C.F.R. § 1003.1(d)(3)(i),[4] rather than making its own independent assessment.

This error or omission prejudiced Solano-Chamba. While El Piojo's initial efforts to have Solano-Chamba aid in his criminal enterprise can be fairly characterized as

[4] In relevant part, that provision reads, "[f]acts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous."

15

motivated by an effort to advance said enterprise, it strains credulity to suggest that motivated the actions that followed after the purported "big arrest." A.R. 154, 170. This is especially so given the specifics of the threat that immediately followed Solano-Chamba's decision to turn down El Piojo's initial advance, which were only set to take place if Solano-Chamba did not "keep [his] mouth shut." A.R. 206. Accordingly, there is a strong possibility that a *de novo* review would have led the Board to conclude that the cartel suspected Solano-Chamba of having been an informant, and that perception was at least one central reason for their acts against him.

*  *  *  *  *

Based on the foregoing, we will grant the petition for review with respect to Solano-Chamba's asylum claim based on the second proposed group and remand for the Board to determine in the first instance whether that group is legally cognizable. *See Gonzalez v. Thomas*, 547 U.S. 183, 185–87 (2006) (holding that, pursuant to "the law's ordinary remand requirement," the Ninth Circuit should have remanded the issue of whether a proposed social group fell within the scope of the statutory term "particular social group" where the Board failed to make a ruling). The Board may also consider Solano-Chamba's arguments that he suffered past persecution, and that he harbors a well-founded fear of future persecution.

IV. **Withholding of Removal**

16

Similar to an asylum claim, eligibility for withholding of removal requires a showing that, as a result of one of the protected grounds, a petitioner's "life or freedom" would be threatened if forced to return to his or her's country of origin. *See* 8 U.S.C. § 1231(b)(3)(A). The difference is that a withholding applicant must establish a clear probability of persecution, as opposed to a well-founded fear. This means that an applicant who fails to establish eligibility for asylum is necessarily unable to meet the requirements for withholding of removal. *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 441 (1987) (explaining that an asylum applicant need only show they are a "refugee," as defined by the statute, whereas a withholding applicant must make the additional showing that they "would be persecuted[.]") (internal quotation marks omitted). The Board predicated its denial of Solano-Chamba's withholding application on its asylum ruling. We will therefore grant the petition and remand as to the withholding claim as well.

## V.    Convention Against Torture

For relief under Article III of the CAT, a petitioner "bears the burden of establishing 'that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Sevoian v. Ashcroft*, 290 F.3d 166, 174–175 (3d Cir. 2002) (quoting 8 C.F.R. § 208.16(c)(2)). This standard has no subjective component, but rather requires a petitioner to meet his or her burden by objective evidence alone. *Id.* (citations and quotations omitted). The Board properly adopted the IJ's rulings on this point. The IJ denied Solano-Chamba's CAT claim because it found that he failed to

17

show past mistreatment that would constitute torture, that he is likely to be tortured upon return, and that the government would in fact acquiesce to said torture. That denial is reviewed for abuse of discretion, which requires reversal only if the decision was "arbitrary, irrational, or contrary to law." *Id.* at 174 (citations and internal quotation marks omitted). Nothing in the record leads us to conclude that it was.

The record is scant on evidence that the police acquiesced when Solano-Chamba was there, or that they would acquiesce should he return. We have defined acquiescence as consisting of evidence that "government officials remain willfully blind to torturous conduct and breach their legal responsibility to prevent it." *Valdiviezo-Galdamez v. Att'y Gen. of U.S.*, 663 F.3d 582, 610 (3d Cir. 2011) (citations and internal quotation marks omitted). Solano-Chamba made one report to police, and fled the country not long after. One such report will not suffice, as it is far less than what we rejected in *Valdiviezo-Galdamez*. *See id.* (affirming the Board's denial where petitioner made five reports that resulted in no prosecutions). Further, Solano-Chamba is correct that the country conditions report and articles he provides reflect that there is police corruption, illegal narcotics trafficking is rampant, and some criminals do in fact act with impunity in Ecuador. But, as the government points out, that same evidence makes clear the government is seeking to combat the problem. *See* A.R. 284 (reporting that more than 400 police officers had been detained for suspected criminal activity, and that all officers will undergo a wide-range of evaluations going forward); *id.* at 289 (referencing police capture of a high-level operative in an illegal arms-trafficking group); *id.* at 301

18

(reporting efforts by the government to reform the judiciary so as to reduce corruption).

Tellingly, this entire case spun out of a government operation that curtailed trafficking efforts by El Piojo's cartel. Indeed, given Solano-Chamba's testimony, the timing of that operation and his encounter with El Piojo was central to El Piojo's belief that Solano-Chamba was an informant.

## VI. Conclusion

For all of the reasons above, we will grant the petition for review in part, and deny in part. We will grant the petition as to the Board's rulings on Solano-Chamba's asylum and withholding of removal applications, and remand to the Board for proceedings consistent with this opinion. We will deny the petition as to his claim for CAT relief.